UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GURCHARAN BROTHERS OIL CO., INC.
a/k/a GURCHARAN AND BROTHERS OIL
COMPANY INC.,

                   Plaintiff,

**MEMORANDUM DECISION
AND ORDER**

              -against-

22-CV-3345 (JMW)

SEI FUEL SERVICES, INC. and 7-ELEVEN, INC.,

                Defendants.
-------------------------------------------------------------X

**A P P E A R A N C E S:**

**Kenneth L. Robinson, Esq.**
Robinson & Associates, P.C.
35 Roosevelt Avenue
Syosset, NY 11791
*For Plaintiff*

**Urs Broderick Furrer, Esq.**
Harriton & Furrer, LLP
84 Business Drive, Suite 302
Armonk, NY 10504
*For Defendants*

**Wicks,** Magistrate Judge:

       Plaintiff is the long-time operator of a Shell gasoline station located on Long Island.

Defendants are the suppliers or franchisors.  There are no claimed breaches by either to the

relationship agreement.  Rather, this case arises out of Defendants' attempted nonrenewal of the

franchise agreement, and Plaintiff's efforts to stave off the nonrenewal and termination.  Before

the Court at this threshold stage is Plaintiff's motion for a preliminary injunction to stay the non-

renewal.

1

This action was brought under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.,* to enforce Plaintiff's rights under certain lease and franchise agreements to sell, as a "retailer", Shell-branded gasoline and operate a convenience store at 100 W. Merrick Road, Valley Stream, New York 11580 ("Premises").  On June 7, 2022, Plaintiff moved by Order to Show Cause to stop the non-renewal and termination process (DE 4).  On June 9, 2022, the Court scheduled a telephone conference to set a briefing schedule and to address the request for a temporary restraining order (Electronic Order dated June 9, 2022).  The conference, which was ultimately held on June 13, 2022,[1] led to an agreement between the parties to extend the non-renewal/termination dates to June 30, 2022, without prejudice to either waiving any arguments (DE 14).[2]  A briefing schedule was adopted and hearing set for June 27. (*Id.*)  By joint letter dated June 22, 2022, the parties advised the Court that neither party considered that fact issues existed that would necessitate an evidentiary hearing and instead sought oral argument on the return date (DE 18).  Defendants answered, denied all material allegations and asserted counterclaims (DE 17). They also filed opposition to the motion and in turn, submitted an Order to Show Cause seeking a declaration, a permanent injunction and judgment of eviction.[3]

On June 27, 2022, counsel appeared before the Court for the hearing on the motion for a preliminary injunction (*see* Transcript of Hearing, DE 29).  The Court reserved decision, affording the parties the opportunity to submit letter-briefs on the issue of whether (and to what

---

[1] On June 8, 2022, the parties consented to the undersigned for all purposes in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73 (*see* DE 9; DE 11).

[2] The subject Notice terminating Plaintiff's right to occupy the Premises was effective June 16, 2022, but the parties agreed to extend the termination date to June 30, 2022.

[3] Defendants' proposed OSC seeks a permanent injunction pursuant to 15 U.S.C. § 2802 of the PMPA, as well as a declaration and order of eviction.  (DE 21.) As raised and agreed to on the record on June 27, since that application does not seek a provisional remedy, but rather ultimate judgment, a briefing schedule was then set on that motion (DE 22; DE 23).

extent) security or a bond should be considered by the Court if a preliminary injunction were to be granted (DE 22). The parties have since filed those letter briefs (*see* DE 25; DE 26; DE 27).

Having considered the submissions of the parties, including argument on the hearing date, the following constitutes the Court's findings of fact and conclusions of law, *see* Fed. R. Civ. P. 65(d) and 52(a); *see also Weitzman v. Stein,* 897 F.2d 653, 658 (2d Cir.1990), and the Court grants Plaintiff's motion for a preliminary injunction as set forth below.

## I.    BACKGROUND

### a.  <u>The Governing Agreements</u>

Since 1996, Plaintiff Gurcharan Brothers Oil Co., Inc. aka Gurcharan and Brothers Oil Company Inc. ("GBOC") operated a Shell service station at the Premises, which includes a gas station and a convenience store.  (DE 4-3 at 1-2.)  GBOC is a "retailer" of Shell-branded gasoline pursuant to 15 U.S.C. § 2801(7) of the PMPA, and a "franchisee" of Defendants SEI Fuel Services, Inc. and 7-Eleven, Inc.  (DE 4-2 at 1; DE 21 at p.5.)  The Franchise Agreement consists of (1) a Retail Facility Lease dated December 12, 2013, eff. January 1, 2014 (Pltfs. Ex. 7 at DE 4-7) and (2) a Retail Sales Agreement[4] also dated December 12, 2013 (Pltfs. Ex. 8 at DE 4-8; Defs. Ex. 2 at DE 21-3; Defs. Ex. 1 at DE 21-1).  Plaintiff had originally entered into these two agreements with Apache Oil Co., Inc.  ("Apache") (DE 21 at p. 5.)  GBOC agreed to purchase Shell products from Apache at the Premises. *Id.*

The Apache documents, to the extent they exist, are less than clear.[5]  Neither party provided the Court with the underlying Master Lease ("ML") to the Premises, although

---

[4] Both parties refer to this agreement as the Fuel Supply Agreement, which is titled "Retail Sales Agreement".

[5] Very few documents were adduced either in the papers or hearing clearly describing the various corporate transactions, ownerships and leasehold interests. During argument, counsel had no

references to that ML are made in a document entitled "Agreement Extending and Amending Lease" dated August 29, 2007 (DE 4-9), another document entitled "First Addendum to retail Facility Lease Agreement" (which is undated, and only an incomplete and unsigned version submitted to Court (*id.* at p. 5), and in the Declaration of Neil Duffy, Northeast Wholesale Fuels Market Manager for SEI Fuel Services, Inc. (DE 21-9). Both agreements were submitted by GBOC in support of the motion, and both would appear to support, or at least raise serious questions, about the lease agreement being extended to June 30, 2027.[6] (*see also* DE 27 and 27-1.)

On June 25, 2019, Apache and Defendant 7-Eleven entered into a sublease of the Premises which, under the terms of the sublease, ends June 30, 2022 (*see* DE 21-4). That Sublease refers to and incorporates by reference, the ML, "including all amendments." (*Id.*) The Sublease term refers to the ML expiration as being "June 30, 2022 with one renewal option of five years each." (*See* Sublease ¶ 9, DE 21-4.) On that same date, namely, June 25, 2019, Apache assigned all of its rights and interest in the Lease and Supply Agreements which, according to Defendants' counsel, expired on December 31, 2016, and since then the parties have continued operating under both agreements on a month-to-month basis. (DE 21 at p. 5.)[7]

**b. The Nonrenewal Notice and Mutual Termination Agreement**

---

choice but to concede that "Apache's documents", which appear shambolic, "are less than a model of clarity. There's no question of that." (DE 29, at p. 34, lines 11-13.)

[6] Apache is not a named party to this action.

[7] GBOC asserts that the ML has an option for Defendants to renew until June 30, 2027, and that Defendants and Apache also entered into a Memorandum of Sublease Agreement extending Defendants' interest in the Marketing Premises until June 30, 2034, with additional options to extend until 2049 (*see* Memorandum of Sublease Agreement, DE 4-12).

4

Defendants sent Plaintiff a Notice of Nonrenewal dated March 18, 2022, advising that pursuant to 15 U.S.C. § 2802(b)(3)(D)(i)(IV), Defendants determined, in good faith and in the normal course of business, that it is uneconomical to renew the Franchise.  (DE 4-4.)  Defendants claim that rent concessions and the low volume of motor fuel sales have resulted in minimal profits.  (*Id.*)  The Notice did not base nonrenewal on any other ground. The Court notes that the Notice did not seek nonrenewal based upon the expiration of the supplier's underlying lease (DE 29, at p. 26, lines 12-15). *See also* 15 U.S.C. § 2802(c)(4) ("loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease"). Further, at the hearing, counsel made clear that the nonrenewal was based upon "non-renewing [Defendants'] month-to-month franchise relationship with the tenant, which is the retail facility lease." (DE 29, at p.59, lines 16-18).  The Notice further advised Plaintiff that "your right to occupy the Premises will also terminate on June 16, 2022, and you must vacate the Premises no later than that date."  (*Id.*)

Shortly thereafter, on March 22, 2022, Defendants provided GBOC with a proposed Mutual Termination Agreement ("MTA") (*see* Everson Decl. ¶¶ 4,5 7, at DE 21-7), requesting GBOC to sign, which it did on that date (DE 4-9). Defendants then sent GBOC the fully executed MTA on May 18, 2022.  (*Id.*)  Two days later, GBOC sent a repudiation of the MTA by certified mail to Defendants (DE 4-6).

Pursuant to 15 U.S.C. § 2802(b)(3)(D)(iii)(I), Defendants made [what they assert to be] a bona fide offer to sell the equipment and leasehold rights – by email dated June 7, 2022, and letter dated June 10, 2022.  (DE 21 at 11; DE 21-5.)   The parties agreed to extend the Lease and Supply Agreement until June 30, 2022 (the date which Defendants' rights in the Premises terminates), but no agreement has been reached as to the offer. (DE 21 at p. 6.)

### c. **The Parties' Positions**

GBOC seeks a preliminary injunction enjoining Defendants from non-renewing and/or terminating the franchise relationship with Defendants.  The arguments are as follows:  *First,* the nonrenewal of the Franchise Agreement is not valid because the determination not to renew was not made in good faith or in the normal course of business since no reasonable changes were proposed; that Defendants' offer was not a "bona fide" offer; and that GBOC is "ready, willing and able" to continue to purchase Defendants' interest.  GBOC argues it will suffer irreparable injury absent injunctive relief, the balance of the hardships weigh in its favor, and there are sufficiently serious questions on the merits. GBOC separately argues that the MTA was timely repudiated under 15 U.S.C. § 2802(b)(2)(D)(iii) of the PMPA, and is thus, null and void.

Defendants oppose, arguing that both the Notice on Nonrenewal and the MTA are valid and binding, that the balance of hardships weigh in their favor since they will be harmed if the injunction is granted, and that there is a substantial likelihood that Defendants will prevail on the merits.

## II.     DISCUSSION

### a. **The Relevant PMPA Provisions**

There is no dispute that the relationship between the parties is governed by the PMPA, since GBOC is a "retailer" of motor fuels (defined in 15 U.S.C. § 2801(7)); a "franchisee" of Defendants (defined in 15 U.S.C. § 2801(4)); Defendants are a "franchisor" of GBOC (defined in 15 U.S.C. § 2801(3)); and the parties have a franchise relationship (defined in 15 U.S.C. § 2801(2)).  There is also no dispute that the Premises are a leased marketing premises (defined in 15 U.S.C. § 2801 (9)).

The PMPA "was enacted to establish 'minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel *by the franchisor or supplier of such fuel*.'" *Roleco Serv. Stations, Inc. v. Getty Refining and Mktg. Co.*, 839 F.2d 88, 91 (2d Cir. 1988) (emphasis in original) (citing S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873).  The intent of the Act was to prevent franchisees from a disparity in bargaining power by prohibiting the franchisor from terminating or failing to renew a franchise without proper notice and specified information.  *Id.* The statute was intended to combat the perceived imbalance of bargaining power between suppliers (oil companies) and retailers (service station dealers).  *See Kessler v. Amoco Oil Co.,* 670 F. Supp. 853, 856 (E.D. Mo. 1987).  The PMPA was enacted in 1978 in response to the Arab oil embargo and ensuing energy crisis in the early 1970s that caused increases in gasoline pricing, tightening of oil supply and increased supply costs which, in turn, led to franchise terminations and conversions to company-owned retail outlets. *See* Janet H. Pumphrey, *Trade Regulation – The "Bona Fide Offer" of Sale Requirement in the Petroleum Marketing Practices Act: Slatky v. Amoco Oil Co.,* 11 W. New Eng. L. Rev. 389, 392-93 (1989) ("Pumphrey, *Trade Regulation"*).

### b.  **The Standard for a Preliminary Injunction in a PMPA Case**

The Court must grant an injunction preventing nonrenewal or termination if certain conditions are met.  The standard for preliminary injunctive relief under the PMPA differ from the traditional standards. That is, a court "shall" grant a preliminary injunction if:

(A) the franchisee shows:

    (i)      the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and

    (ii)     there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and

(B) the Court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.[8]

*See* 15 U.S.C. § 2805(b)(2); *see also Persaud v. Exxon Corp.*, 867 F. Supp. 128, 136-37 (E.D.N.Y Oct. 31, 1994) (stating that § 2805(b)(2) "directs the entry of a preliminary injunction if [the] three-part showing has been made").

"A franchisee's burden of proof under section 2805(b)(2)(A)(ii) is less severe than is generally required under Rule 65 [of the Federal Rules of Civil Procedure]." *Nassau Blvd. Shell Serv. Station, Inc. v. Shell Oil Co.*, 875 F.2d 359, 363 (2d Cir. 1989) (alteration in original) (internal quotation marks and citation omitted). While Rule 65 of the Federal Rules of Civil Procedure requires the movant to show a strong or reasonable likelihood of success, the PMPA only requires a franchisee to show a reasonable chance of success on the merits. *Id.* "The standard for granting preliminary injunctive relief under the PMPA is a more liberal version of the alternative general equity standard of the Second Circuit, hence the granting of an injunction turns primarily on a balancing of hardships." *Wisser Co. v. Texaco, Inc.*, 529 F. Supp 727, 735 (S.D.N.Y. 1981) (internal citation omitted) (finding that the balance of hardships favored franchisee over franchisor where cutting off supply would risk undermining franchisee's supply/lease agreements and pose a grave risk to franchisee's livelihood, and such injunctive

---

[8] Although this relaxed preliminary injunction standard is available to franchisees under the PMPA, the same standard is not applied to franchisors seeking provisional relief in the form of an injunction. *See Persaud v. Exxon Corp.*, 867 F. Supp. 128, 141 (E.D.N.Y. 1994). As such, when franchisors seek the relief, the traditional standard of the Second Circuit must be applied. *See id.* That is, a franchisor's request for relief "should not be granted 'automatically' at a preliminary stage if the franchisor does not meet the traditional requirements for a preliminary injunction." *Id.*

8

relief would only cause franchisor to continue giving a three and three-quarter cent per gallon discount on gasoline).

It is against this backdrop that the Court considers GBOC's application.

**c.  Whether the Franchise Relationship has Been Terminated or Not Renewed**

**i.      The MTA and Repudiation**

15 U.S.C § 2802(b)(2)(D) provides:

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

> (D) An agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship, if—
>
> > (i)      such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise;
> >
> > (ii)     the franchisee is promptly provided with a copy of such agreement, together with the summary statement described in section 2804(d) of this title; and
> >
> > (iii)    within 7 days after the date on which the franchisee is provided a copy of such agreement, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement.

15 U.S.C § 2802(b)(2)(D).

On March 18, 2022, Defendant provided Plaintiff with written notice of non-renewal of the Franchise Relationship.  (DE 21 at 10; DE 21, Ex. 4.)  On March 22, 2022, Defendants hand delivered a copy of the proposed unsigned Mutual Termination to Ekam Cattry, President of GBOC.  (DE 21-7.)  Cattry signed two copies and Everson took one of the originally signed Mutual Terminations and left one with Cattry.  (*Id.*)  On March 23, 2022, David Goodrum (Wholesale Operations Director of SEIF) counter-signed the Mutual Termination using DocuSign.  (*Id.*)  Via email on May 4, 2022, Cattry requested a copy of the fully executed

Mutual Termination.  (*Id.*)  Everson sent a copy to Cattry on May 18, 2022.  (*Id.*)  On May 20, 2022, Cattry sent a repudiation letter to Defendants.  (*Id.*)

To fulfill the requirements of 2802(b)(2)(D), there must be an "agreement, in writing, between the franchisor and the franchisee to terminate the franchise or not to renew the franchise relationship."  15 U.S.C. § 2802(b)(2)(D).  Here, the writing requirement is satisfied as the terms set forth were in writing.  (DE 4, Ex. 5.)

Furthermore, it is also necessary that "such agreement is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise[.]"  Here, the time requirement is satisfied as the agreement was entered into less than 180 days prior to the conclusion of term.  Notice of Non-Renewal was sent on March 18, 2022, and the conclusion of the term would be June 16, 2022, extended to June 30, 2022, well within the 180-day time limit. (DE 4 Ex. 4.)  Regardless of whether the MTA was entered into on March 22, 2022 (when only Cattry signed) or March 23, 2022 (when Goodrum also signed), the MTA also falls within the 180-day time limit.  That, however, does not end the inquiry since the final question -- sharply disputed by the parties -- is whether the MTA was repudiated timely by GBOC.

A franchisor may terminate or not renew if certain preconditions are met.  If the nonrenewal is based upon an MTA, then the franchisee has a 7-day period from the time it receives the "agreement" to repudiate.   The statute provides that termination is effective, unless repudiated by the franchisee as follows:

> (D)*An agreement, in writing, between the franchisor and the franchisee* to terminate the franchise or not to renew the franchise relationship, if—
>
> > (i) *such agreement* is entered into not more than 180 days prior to the date of such termination or, in the case of nonrenewal, not more than 180 days prior to the conclusion of the term, or the expiration date, stated in the franchise;

(ii) the franchisee is promptly provided with a copy of *such agreement*, together with the summary statement described in section 2804(d) of this title; and

(iii) within 7 days after the date on which the franchisee is provided a copy of *such agreement*, the franchisee has not posted by certified mail a written notice to the franchisor repudiating such agreement.

15 U.S.C. § 2802(b)(2)(D) (emphasis added).

Defendants claim "such agreement" was provided to GBOC on March 18.  GBOC, on the other hand, claims that "such agreement" was only provided May 18, since that was the first and only time that a fully executed agreement was provided. This raises the question of when GBOC was "provided with a copy of such agreement" as required by the statute and at what point the seven-day window for the franchisee to repudiate would begin.  Put simply, the question is whether the phrase "such agreement" in subclause (iii) refers to a proposed agreement or one executed.

Subdivision (D) begins with clarity:  "*An agreement, in writing, between the franchisor and the franchisee* to terminate the franchise or not to renew the franchise relationship. . ." *Id.*  The subclauses that follow use the phrase "such agreement" consistently, and unmistakably refer to "an agreement, in writing, between" both parties.  It says nothing about a proposed, suggested, draft or unsigned agreement.

Undefined in the statute, Black's Law Dictionary defines an "agreement" as "a manifestation of mutual assent by two or more persons." BLACK'S LAW DICTIONARY (11th ed. 2019).  "The conduct manifesting such assent may be words or silence, action or inaction, but '[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'" *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 120 (2d Cir. 2012)

11

(internal quotation marks omitted) (citing Restatement (Second) of Contracts § 19(2) (Am. L. Inst. 1979)).

Here, Defendants provided GBOC with an unsigned proposed MTA on March 18, 2022. There is nothing in the record to indicate that the parties had agreed to the terms beforehand. (*see* Everson Decl. ¶¶ 4,5 7 at DE 21-7).  GBOC signed that same date (*id.*). Defendants then sent GBOC the fully executed MTA on May 18, 2022.  (*Id.*)  Two days later, GBOC sent the repudiation notice to Defendants (DE 4-6).   Providing GBOC the proposed MTA without a signature cannot be viewed as satisfying the requirement to provide "such agreement," since a proposed agreement is just that: proposed, and not an agreement until executed by all indicating an intent to be bound.

The use of the word "repudiation" in 2802(b)(2)(D) bolsters the argument that Congress intended that in order for there to be a valid "agreement," there must be a signature from both parties. *See generally* 15 U.S.C. § 2802(b)(2)(D).  Repudiation is defined as "[a] contracting party's words or actions that indicate an intention not to perform the contract in the future." BLACK'S LAW DICTIONARY (11th ed. 2019).  Obligations are created when parties sign and intend to be bound by the terms.  *See Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, No. 05CIV.10528 (CSH) (DFE), 2008 WL 4579758, at *6 (S.D.N.Y. Oct. 14, 2008) (holding that a formal signature on a written document indicates an intent to be bound and that an unsigned document was unable to be enforced); *see also Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 97 (2d Cir. 1994) (holding that where an agreement has space for both parties to sign it is clear that the agreement would take effect only after both parties had signed the document).

Congress could have instead easily used the term "rejection", rather than "repudiate". Rejection, of course, is a refusal or declination to accept a contractual offer.  *See* BLACK'S LAW

DICTIONARY (11th ed. 2019).  To hold otherwise, and to adopt Defendants' argument, would mean that once a franchisor provides a proposed MTA to a franchisee, the 7-day clock for the franchisee to repudiate begins to run then, and could arguably expire before the franchisee even signs the agreement.  There is no support that Congress intended that construction.

Furthermore, the argument that "such agreement" must be both signed by GBOC and Defendants is bolstered by the fact that the PMPA expressly and "specifically places limits on the franchisor's, rather than the franchisee's, termination or nonrenewal of a franchise."  *Riverdale Enterprises, Inc. v. Shell Oil Co.*, 41 F. Supp. 2d 56, 67 (D. Mass. 1999); 15 U.S.C. § 2802(b).  "These limits were crafted to protect the franchisee."  *Id*. Furthermore, the Second Circuit has also repeatedly cautioned that "there must be strict compliance" with the provisions of the PMPA by the franchisor.  *See Ceraso v. Motiva Enterprises, LLC*, 326 F.3d 303, 314 (2d Cir. 2003); *see also Jimico Enterprises, Inc. v. Lehigh Gas Corp.*, 708 F.3d 106, 114 (2d Cir. 2013).  Gleaning the Congressional intent to protect the franchisee, it is unlikely Congress would have vested the franchisor unilateral bargaining power of withholding their signature and having the franchisee's 7-day time limit to repudiate the agreement begin without the franchisee having a clear indication that there was a completed agreement.

Defendants offer a single case in support of their argument, *Persaud v. Exxon Corp.*, 867 F. Supp. 128 (E.D.N.Y. 1994) (Seybert, J.).  However, *Persaud* is readily distinguishable.  In *Persaud* the agreement at issue was signed by both parties and when receiving a duplicate copy of the fully signed agreement, the Plaintiff had further signed acknowledging receipt of a fully executed copy of the Mutual Termination and General Release Agreement.  *See Persaud v. Exxon Corp.*, 867 F. Supp. at 133 (holding that the seven-day window began at the moment the Plaintiff had received the duplicate fully executed document).  Here, the proposed agreement

was signed by Plaintiff on March 22, 2022, but the fully executed document was finally given to Plaintiff almost two months later on May 18, 2022.  (DE 21-7, ¶7.)

As required by 15 U.S.C. § 2802(b)(2)(D) a summary statement was provided to the Plaintiff attached to the Notice of Nonrenewal. (*Id.*; DE 4 Ex. 4.) Although provided a duplicate copy of the proposed agreement when signing, GBOC was not provided with a copy of the "agreement" until the Plaintiff was sent the document that included *both* GBOC's and Defendants' signatures on May 18, 2022.  (*Id.*)  Therefore, as required by the statute, the seven-day window to repudiate the Mutual Termination Agreement began on May 18, 2022.  15 U.S.C. § 2802(b)(2)(D); *see also Persaud*, 867 F. Supp. at 133-34.  When notice was sent to the Defendants by GBOC repudiating the agreement by certified mail, return receipt requested, on May 20, 2022, this was well within the seven-day window and is a valid repudiation as contemplated by the PMPA. (DE 4 Ex. 6.)   Accordingly, the repudiation of the MTA was valid.

Having found the repudiation of the MTA valid, the Court must nevertheless determine whether there are sufficiently serious questions concerning the validity of the grounds for nonrenewal.

### d.  Whether the Nonrenewal of the Franchise Relationship is Valid and Binding or Plaintiff Has Demonstrated Sufficiently Serious Questions Exist Going to the <u>Merits to Make Such Questions a Fair Ground for Litigation</u>

Here, Defendants' Precondition and Grounds for Termination or Nonrenewal is based solely on the "good faith", "uneconomical" nonrenewal provision found in 15 U.S.C. § 2802(b)(3)(D)(i)(IV), setting forth permissible bases upon which to terminate or nonrenew as follows:

(D) . . . any franchise entered into. . ., a determination made by the franchisor in good faith and in the normal course of business, if—

(i)    such determination is—

14

*     *     *

>  (IV) *that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee;*

> (ii) with respect to a determination referred to in subclause (II) or (IV), such determination is not made for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for such franchisor's own account; and

> (iii) in the case of leased marketing premises such franchisor, during the 90-day period after notification was given pursuant to section 2804 of this title, either—

>> (I) *made a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises*; or

>> (II) if applicable, offered the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

15 U.S.C. § 2802(b)(3)(D)(i)(IV) (emphasis added).

Under 15 U.S.C. § 2805(c), GBOC must prove the occurrence of the nonrenewal of the franchise, and Defendants bear the burden to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b).  *See Wisser Co. v. Texaco, Inc.,* 529 F. Supp. 727, 733 (S.D.N.Y. 1981).

In addition to whether the MTA was properly repudiated (addressed above), GBOC also asserts that the following serious questions warrant fair grounds for litigation and entitle it to a preliminary injunction: (1) did the March 18, 2022 Notice of Non-Renewal violate the PMPA? (2) did Defendants determine to renew Plaintiff's Franchise Agreement in the normal course of business and in good faith? (3) did Defendants make any offer of reasonable additions and/or reasonable changes to Plaintiff's Franchise Agreement? (4) did Defendants make a bona fide

15

offer to sell, transfer and/or assign its interest in the Marketing Premises to GBOC? (5) what was Defendants' interest in the Marketing Premises at all times relevant to this action? (6) did Defendants honor the covenant of good faith and fair dealing implied in the Franchise Agreement? (DE 4-2 at 4-5.)

Defendants in turn argue that the nonrenewal was valid, binding and in conformance with the requirements of the PMPA. Specifically, Defendants assert that they complied with 15 U.S.C. § 2802(B)(3)(D)(i)(IV) by making a determination in good faith and in the normal course of business that it was uneconomical to renew the Franchise Relationship, and they offered to sell the equipment and the leasehold interest within 90 days after nonrenewal notification ("bona fide offer"), and otherwise satisfied the procedural requirements pursuant to 15 U.S.C. § 2804(c).[9]

The key question in this case at bottom is: *Has* GBOC *demonstrated a sufficiently serious question going to the merits to make the question a fair ground for litigation?* In determining this issue, the Court must carefully consider the burden imposed upon GBOC as franchisee under section 2802(b)(2)(A)(ii). Generally,

> [t]he use of the terms "serious question" and "fair ground" indicates that it intended a significant showing of something that would constitute some reasonable chance of success even though it could not be shown that there was a likelihood of probability of success as is required in the ordinary preliminary injunction matter.
> * * * * * *
> [The PMPA] is intended to require less than that but it is clear that it does require something. Instead of a "strong showing" or "probability" of success, the terms "serious

---

[9] Under 15 U.S.C. § 2804(c) notification terminating a PMPA franchise "(1) shall be in writing; (2) shall be posted by certified mail or personally delivered to the franchisee; and (3) shall contain –(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor; (B) the date on which such termination or nonrenewal takes effect; and (C) the summary statement prepared under subsection (d) of this section." Plaintiff's OTSC does not dispute that the notification satisfied such requirements.

question" and "fair ground for litigation" suggest merely a reasonable chance of success, something far less than the probability or likelihood.

*Saad v. Shell Oil Co.,* 460 F. Supp. 114, 116-17 (E.D. Mich. 1978).

The Court therefore must evaluate if there is a serious question as to whether the termination or non-renewal was the result of action taken by the franchisor in good faith and in the normal course of business.

### i.      Bona Fide Offer

GBOC submitted a detailed affidavit from Ekam Cattry, the President of Gurcharan Oil. (DE 4-15.)  Mr. Cattry states the history of the relationship of the franchise, and avers that Defendants never made the requisite bona fide offer to sell/transfer the interest in the Marketing Premises.  (*Id.*)  Defendants' opposition includes the offer dated June 7, 2022 (DE 21-6), by which Defendants gave Plaintiff the right to purchase all of Defendants' interest in the subject property, including the equipment at the property, and the remainder of 7-Eleven's leasehold interest.  (DE 21 at 11.)  The entirety of the offer is set forth in an email, after litigation was commenced, from counsel for Defendants to counsel for GBOC (DE 21-6).  It states:

> Pursuant to 15 U.S.C. §2802(b)(3)(D)(ii)(I), SEIF hereby offers to sell, transfer and assign to Dealer, its interest in the Premises. More specifically, SEIF hereby offers to sell to Dealer the underground storage tanks and petroleum marketing equipment located at the Premises ("Equipment") and assign SEIF's sub-leasehold interest in the Premises on the following terms:
>
> > 1. SEIF will sell the Equipment to Dealer for $100,000 pursuant to my client's form bill of sale (dealer shall agree to defend and indemnify seller from any and all environmental claims, shall maintain suitable environmental insurance, and shall deposit a deposit of $50,000 in escrow to protect seller from any failure by Dealer to maintain environmental insurance);
> >
> > 2. SEIF will assign its sub-leasehold interest in the Premises to Dealer for $1.00 pursuant to my client's form of assignment (despite the filed memorandum of sublease, my client believes that its lease term expires on June 30, 2022 and has advised Apache accordingly – copies of all leases

17

documents and amendments will be provided shortly, which documents
are for your eyes only); and

3. Dealer has until June 16, 2022 at 5:00 PM to accept such offer.

At oral argument, Defendants' counsel stated that the offer is for whatever rights

Defendants may have (DE 29, at pp. 50-51 *passim*).  Plaintiff responded to the offer, but rejected

the package as a "whole," and therefore no agreement to purchase has been made, despite the

offer being made.

At the hearing, GBOC's counsel argued that the mere fact that the offer was made after

the litigation demonstrates that it was not in good faith.  Counsel, however, was unable to

provide any authority or case law to support the argument that timing alone negates bona fide.

So how do the courts consider whether an offer is "bona fide" within the meaning of the PMPA?

> It is settled law that a bona fide offer under the PMPA is measured by an
> objective market standard. To be objectively reasonable, an offer must
> "approach[] fair market value." *Slatky,* 830 F.2d at 485. *See also LCA Corp.,* 916
> F.2d at 437; *Sandlin v. Texaco Refining and Marketing, Inc.*, 900 F.2d 1479, 1481
> (10th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990);
> *Brownstein*, 604 F.Supp. at 315. "[T]he overriding purpose of Title I of the PMPA
> is to protect the franchisee's reasonable expectation of continuing the franchise
> relationship." *Slatky,* 830 F.2d at 484. When a franchisor decides for legitimate
> business reasons not to renew a franchise relationship, the franchisor must give
> the franchisee a bona fide offer to purchase the station. The offer to buy at fair
> market value serves as a second, and distinct, layer of protection, assuring the
> franchisee an opportunity to continue to earn a livelihood from the property while
> permitting the distributor to recover the fair market value of the property sold and
> to end the franchise relationship. *Id*.
>
> The facts of each case will set the terms of what constitutes a bona fide offer.

*Ellis v. Mobil Oil,* 969 F.2d 784, 787-78 (9th Cir. 1992); *see also Roberts v. Amoco Oil Co*., 740

F.2d 602, 607 (8th Cir. 1984) (distinguishing the "good faith" requirement in section

2802(b)(3)(D)(i) attaching to franchisor's decision to terminate from the requirement in section

2802(b)(3)(D)(iii)(I) that the offer be bona fide, noting whether the franchisor's "offer of sale to

18

[the franchisee] was `bona fide' may certainly involve notions of subjective good faith, but a `bona fide offer to sell' the service station premises has been objectively defined in the PMPA").

In *Sandlin v. Texaco Refining and Marketing Inc.,* 900 F.2d 1479 (10th Cir. 1990), the court considered (after trial) whether the offer price was objectively reasonable:

> It is essential to recall Congress did not intend to intrude courts into the marketplace by permitting "judicial second guessing of the economic decisions of franchisors." *Svela v. Union Oil Co. of Calif.*, 807 F.2d 1494, 1501 (9th Cir. 1987). While Congress intended the good faith test to prevent franchisors from shielding their decisions with artifice, the normal course of business element examines whether the franchisor made the choice through its usual decision-making process. "The legislative history of the PMPA indicates that courts should look to the franchisor's intent rather than to the effect of his actions, making (the good faith test] a subjective test." *Svela*, 807 F.2d at 1501 (citation omitted). However, we use an objective test to decide whether an offer is bona fide. See *Slatky v. Amoco Oil Co*., 830 F.2d 476 (3d Cir. 1987).

*Id.* at 1481.

Defendants' offer (DE 21 at 11 and 21-6) is to essentially offer to GBOC whatever Defendants have, whatever that may be. It is far from clear precisely what it is that Defendants are in fact offering, since Defendants do not know with certainty at this juncture what precise rights they currently have. (*See* DE 29, at p. 22, lines 17-20 ("My client has no objection to the plaintiff staying but my client doesn't have any authority to extend what it doesn't *believe* it has").) [10] In the world of contracts, "vague or uncertain offers . . . are insufficient to form or modify an enforceable contract." *Cohen Lans LLP v. Naseman*, 14-CV-4045 (JPO), 2017 WL 477775, at *5 (S.D.N.Y. Feb. 3, 2017). Here, the very uncertainty of the scope of what is being offered, casts serious doubt, or at least raises serious questions at this juncture in the litigation, of

---

[10] The offer itself also makes clear that Defendants are not sure what they are offering: "2. SEIF will assign its sub-leasehold interest in the Premises to Dealer for $1.00 pursuant to my client's form of assignment (despite the filed memorandum of sublease, my client *believes* that its lease term expires on June 30, 2022 and has advised Apache accordingly – copies of all leases documents and amendments will be provided shortly, which documents are for your eyes only);" (emphasis added).

whether it was bona fide.

Accordingly, on the record before the court on this application, the bona fide offer itself raises serious questions that in this Court's view are sufficient grounds warranting litigation.

### ii.    Whether Renewal of the Franchise Relationship is Likely to be Uneconomical

GBOC argues that the economical bases Defendants rely on are unfounded and thus, not made in the normal course of business and in good faith.  (DE 4-3 at 13) (citing to Exhibit 7 showing the amount of gallons of fuel sold from 2020-2022; Exhibit 8 showing prices Defendants have charged Plaintiff for fuel versus the lower prices that other suppliers are charging, which are resulting in lower sales).  Defendants submit a declaration by Neil Duffy, Northeast Wholesale Fuels Market Manager for Defendant SEIF.  (DE 21-9.)  Duffy states that pursuant to the Supply Agreement, the monthly minimum gallons, based upon each month, of petroleum products to be sold at the Property ranges from 81,000 to 102,000 gallons.  (*Id.*) Duffy states that Plaintiff has not purchased more than 20,000 gallons of petroleum products in any month since June 2021.  (*Id.*)  These numbers were not challenged by GBOC in the papers or at the hearing (DE 29, at p. 16-17).  On the other hand, Defendants did not give any prior notice in letters to GBOC that it "was not selling enough gasoline" (DE 29, at 49, lines 20-22).[11]

Duffy's role before renewing any Franchise Relationship "typically" involves reviewing the terms of the agreements and station sales history to assess whether renewal is economically beneficial for Defendants.  (DE 21-9)  Here, Duffy determined that in the normal course of business, it would not matter how much Defendants charged GBOC for petroleum products because no profit could be made considering volume history and administrative costs.  (*Id.*)

---

[11] Importantly, however, the nonrenewal is not based upon breach of the franchise agreement. (DE 29, at p. 50, lines 1-2).

Based on that determination, Duffy notified Apache that 7-Eleven would not be renewing the Sublease beyond June 30, 2022.  (*Id.*)  Thus, Defendants argue that their decision to terminate the Franchise Relationship was proper.

"In enacting the PMPA, Congress intended 'that franchisors be accorded sufficient flexibility to respond to market conditions . . . [and] certainly did not contemplate the perpetuation of an economically burdensome franchise relationship.'" *Beirne v. Getty Petroleum Corp.*, 707 F. Supp. 632, 635 (E.D.N.Y. June 17, 1988) (citing *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1223 (7th Cir. 1982)).  Although the PMPA does not define "good faith" and "in the normal course of business," the Senate Report states that "good faith" aims to preclude sham determinations as a basis for non-renewal and "normal course of business" requires that the uneconomical determination be the result of the franchisor's normal decision making process, and aims to avoid judicial scrutiny of the business judgment itself.  *See Van Diest v. Conoco*, Inc., 851 F. Supp. 1415, 1418 (D. Neb. 1994) (citing S.Rep. No. 731, 95th Cong., 2d Sess. 37, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873).[12]  Good faith "refers to the subjective intent of the franchisor, i.e., that the real reason in not renewing the franchise was the fact that it was uneconomical."  *Kessler v. Amoco Oil Co.*, 670 F.Supp. 853, 857 (MO. E.D. 1987) (quoting S.Rep. No. 95-731) *reprinted in* 1978 *U.S.Code Cong. and Ad.News,* 873, 895–96.  To establish that the nonrenewal decision was made in the normal course of the franchisor's business, the

---

[12] "[T]he law is clear that where the termination is reasonable, as it is if it falls under one of the twelve enumerated events in section 2802(c), the limitations of section 2802(b)(3)(D) do not apply." *Zorbas v. Mobil Oil Corp.*, No. 92 CV 4332 (DRH), 1993 WL 50536, at *5 (E.D.N.Y. Feb. 23, 1993) (citing *Russo v. Texaco, Inc.,* 808 F.2d 221, 225 (2d Cir.1986) (when event is encompassed by section 2802(c), "a court need make no further inquiry as to the reasonableness of the termination" and "a judicial determination may be made that an event, other than one enumerated in this list, or an event similar but not identical to one enumerated in the list, constitutes an event which is relevant to the franchise relationship as a result of which termination or nonrenewal is reasonable."); *see also MS & BP, LLC v. Big Apple Petroleum, LLC*, 2015 WL 2185038, at * 5 (E.D.N.Y. May 8, 2015) (same).

franchisor must only show that the "decision was the result of the franchisor's normal decision-making process."  *Id.* at 857-59 (internal quotation marks and citation omitted).

Here, Defendants have submitted evidence that terminating the lease was a decision made in good faith and done in the normal course of business.  Mr. Duffy typically reviews the sales history when evaluating whether to renew franchise agreements, and here, GBOC was not meeting the required petroleum product purchases since June of 2021.  GBOC asserts it has no control over the prices that Defendants are charging per gallon and that recent hikes have caused the decline in sales.  However, such recent price changes do not account for why Plaintiff has not met their sales requirements since June of 2021.

The court in *Van Diest v. Conoco, Inc.,* 851 F. Supp. 1415 (D. Neb. 1994) addressed the definition of "good faith" and "in the normal course of business."   The court there noted the need for balance between avoiding intrusion into the business judgment of franchisors, while at the same time providing adequate protection for franchisees:

> The PMPA does not define the terms "good faith" and "in the normal course of business." However, the Senate Report states:
>
>> This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal. The second test is whether the determination was made "in the normal course of business". Under this test, the determination must have been the result of the franchisor's normal decision-making process. These tests provide adequate protection of franchisees from arbitrary and discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. S. Rep. No. 731, 95th Cong., 2d Sess. 37, *reprinted in* 1978 U.S. Code Cong. Ad. News 873, 896; *quoted in Beck Oil v. Texaco Refining Marketing,* 822 F. Supp. 1326, 1329 (C.D. Ill. 1993).

*Id.* at 1418.

Although Defendants outline in the Duffy Affidavit that GBOC has not been meeting its required minimum monthly gallonage since January 2020, they did not declare any breach, nor did they non-renew or terminate on that basis.  Not that Defendants were required to, but there is

22

no indication in the record that the low gallonage was ever even raised with GBOC prior to the nonrenewal.  That lack of communication and abrupt nonrenewal also permeates the counts of the complaint alleging lack of good faith (DE 1, at ¶¶ 36-57.)

### e. On Balance, if a Preliminary Injunction is Granted, are the Hardships Imposed on Defendants Less than the Hardship that Would be Imposed on Plaintiff if the <u>Preliminary Injunction Were Not Granted?</u>

Ordinarily, entitlement to a preliminary injunction requires a party to establish irreparable harm, but under the PMPA the party need only establish that if a preliminary injunction is granted, the *balance of hardships* imposed on the non-movant are less than those imposed on the movant.  *See* 15 U.S.C. § 2805(b)(2).  GBOC argues that it would be irreparably harmed (a higher burden than it is required to prove) if it loses the franchise because this is a family business that has been in operation for 26 years.  (DE 4-3 at p. 9.)  Without a preliminary injunction, GBOC asserts it will lose the right to use the "Shell" trademark and attendant goodwill, and lose its use of the Shell credit card, right to receive and sell its supply of "Shell" motor fuel, and its substantial investment.  (*Id.* at p. 11.)  GBOC further argues that if a preliminary injunction were issued, Defendants would merely be required to continue doing business with Plaintiff – a faithful and loyal customer.  (*Id.*)  Defendants argue that if GBOC is permitted to remain in possession of the Premises, 7-Eleven will be held liable to Apache for failing to turn over the property free from GBOC's tenancy.  (DE 21 at p. 14.)  Defendants also assert that GBOC's claim about irreparable harm due to losing "time and money" that it invested in the Premises since 1996 is irrelevant since Plaintiff knew all along that they were a tenant, especially in light of operating on a month-to-month basis since January 1, 2017.  (*Id.* at p. 14-15.)

It is clear from the submissions on this motion that the balance of hardships falls more heavily upon GBOC.  The disparity in resources of the parties – one of the underpinnings of the rationale for the enactment of the PMPA, coupled with the significant length of time the family owned the business, as well as that GBOC will continue to operate and pay Defendants during the pendency of the injunction, all lead to the conclusion that the hardships are born more heavily by GBOC in the absence of a preliminary injunction.

Accordingly, GBOC's motion for a preliminary injunction to stay the non-renewal is granted as GBOC has met its burden of showing that Defendants have terminated the relationship (through the Notice of Nonrenwal), that there exist serious questions that warrant litigation, and that the balance of hardships weighs more heavily on GBOC.

### f.  **The Bond**

Rule 65(c) provides that the court must consider a bond when issuing a preliminary injunction or temporary restraining order.  Fed. R. Civ. P. 65(c).  The bond requirement is mandatory. *City Auto, Inc. v. Exxon Co., U.S.A., Div. of Exxon Corp.*, 806 F. Supp. 567 (E.D. Va. 1992).  The fact that an injunction is sought in the context of a PMPA action 15 U.S.C. §2805(b)(3) does not vitiate this requirement.  Indeed, section 2802(b)(3) expressly states that the Court may require a franchise to post such a bond, "[n]othing in this subsection prevents any court from requiring the franchisee in any action under subsection (a) to post a bond, in an amount established by the court, prior to the issuance or continuation of any equitable relief." *See also Fayad v. Mobil Oil Corp.,* 1980 U.S. Dist. Lexis 9126, at *3 n.1 (D. Mass.  Apr. 23, 1980) (". . . the court's authority to require posting of bond as a condition for granting any equitable relief remains unaffected."); *City Auto, Inc. v. Exxon Co., U.S.A., Div. of Exxon Corp*., 806 F. Supp. 567, 568 (E.D. Va. 1992) (same). Some courts, after consideration, have dispensed

with the bond requirement in the PMPA context.  *See, eg., Wesley v. Mobil Oil Corp.,* 513 F.

Supp. 227 (E.D. Pa. 1981) (injunction granted without bond).  In short, whether to require on,

and if so, the amount, is within the court's discretion.  *See Barnes v. Gulf Oil Corp.,* 824 F.2d

300 (4th Cir. 1987).

      With respect to the amount of a bond, Defendants urge this Court to require that Plaintiff

post a bond in the amount of no less than $50,000, claiming Defendants may be held liable to

Apache for failing to turn over the Property without GBOC present.  Agreeing that the "extent to

which 7-Eleven will be liable to Apache cannot yet be quantified," (DE 25), GBOC, not

surprisingly, argues for "no bond." (DE 26, at p. 3.)

      There is certainly some risk of damages to Defendants in the event it is wrongfully

enjoined.  The scope and amount of those damages is less than clear from the submissions in

light of the lack of documentation from Apache.  Accordingly, the Court declines to require the

posting of the amount requested by Defendants.  However, as a condition of the issuance of this

preliminary injunction, GBOC is directed to post security in the amount of $10,000. GBOC must

obtain and file with the Court on or before July 11, 2022, proof of securing the Bond in the

amount of $10,000.  Failure to do so on or before that date will result in the automatic vacatur of

the preliminary injunction.

### III.    <u>CONCLUSION</u>

      Based upon the foregoing, GBOC's application for a preliminary injunction is granted as

follows.

        1.  Defendants, including its agents, servants, employees, attorneys, affiliates, assigns

            and representatives, are preliminarily enjoined during the pendency of this action

from:

     (a)  terminating and/or nonrenewing Plaintiff's interest in the gasoline service franchise and property located at 100 W. Merrick Road, Valley Stream, New York; and

     (b)  terminating the Retail Facility Lease dated December 13, 2013 between Plaintiff, as Tenant and Defendant 7-Eleven, Inc., as Landlord of the Marketing Premises, as successor-in-interest to Apache Oil Company, Inc. ("Lease") and the Retail Sales Agreement dated January 1, 2014 between Plaintiff and SEI Fuel Services, Inc. for the Premises.

2.  This injunction is subject to Plaintiff obtaining and filing with the Court on or before July 11, 2022, proof of securing the Bond in the amount of $10,000.  Failure to do so on or before that date will result in the automatic vacatur of the preliminary injunction.

3.  The parties are directed to meet and confer, and file on or before July 11, 2022 a Rule 26(f) report with a proposed discovery schedule on an expedited timetable for the Court's consideration.  An initial conference to discuss scheduling and adoption of the scheduling order will take place through Zoom on July 13, 2022 at 4:30 p.m.

Dated: Central Islip, New York
       June 30, 2022

S O   O R D E R E D:

/S/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge

26